**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | | |
|---|---|---|
| In re:<br><br>BRANDON MICHAEL CHASEN, SR.<br><br>Debtor. | ) | Case No. 25-15437<br>Chapter 7 |
| PR GIV, LLC<br>1959 Calle Loiza # 6397<br>San Juan, PR 00914<br><br>Plaintiff,<br><br>v.<br><br>BRANDON M. CHASEN, SR.<br>1501 Yamato Road # 3007<br>Boca Raton, FL 33431<br><br>Defendant. | ) | Adv. No. ____________ |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS**

Plaintiff, PR GIV, LLC ("**PR GIV**"), by counsel, requests that the court determine that the debtor, Brandon M. Chasen, Sr.'s ("**Debtor**") debts to PR GIV are nondischargeable, for the following reasons:

PARTIES

1. PR GIV is a Puerto Rico limited liability company owned by Anthony Bobulinski ("**Bobulinski**").

2. The Debtor is the debtor in this bankruptcy case.

## JURISDICTION

3. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157, and 11 U.S.C. § 523.

4. This adversary proceeding is a core proceeding as provided in 28 U.S.C. § 157(b)(2)(I).

5. Pursuant to Local Rule 7012-1, PR GIV consents to the entry of final orders and judgments by this court.

## FACTS COMMON TO ALL COUNTS

### A. The Promissory Note

6. In the summer of 2023, a mutual friend introduced Bobulinski to the Debtor and his business partner, Paul Davis ("**Davis**"). The Debtor and Davis told Bobulinski about their real estate business and loans they were then seeking. That fall, Davis told Bobulinski that he and the Debtor needed a mezzanine lender in connection with the Debtor and Davis's real estate portfolio, which was owned by various limited liability companies (the "**Borrowers**")[1].

7. Bobulinski was reluctant to have PR GIV make a loan and told Davis and the Debtor that PR GIV would need personal guarantees and other security even to consider the large loan Davis and the Debtor were seeking.

8. To induce PR GIV to make a loan the Debtor and Davis, among other things, agreed: (a) the funds PR GIV loaned to the Borrowers would be used solely for the respective real properties each of the Borrowers owned; (b) to pledge to PR GIV as collateral deposit accounts the Debtor, Davis, and the Borrowers maintained at United Bank, as well as securities the Debtor

[1] The "Borrowers" include the following entities: CC 7 and 9 E Eager Street LLC, CC 8 & 21 E Eager Street LLC, CC 4 and 10 E Biddle Street LLC, CC 10 and 12 W Biddle Street LLC, CC 1114 Saint Paul Street LLC, CC 817 Saint Paul Street LLC, CC 906 and 935 Saint Paul Street LLC, CC 921 and 923 Saint Paul Street LLC and CC 330 N Charles Street LLC, and Chasen Acquisitions LLC.

maintained in an NYLife Securities, LLC account; and (c) amend the terms of the operating agreements for the Borrower to, among other things, add PR GIV as a member with voting rights and ensure that amounts owed to PR GIV were repaid before the Borrowers received any money.

9. On November 15, 2023, PR GIV began funding the first of two tranches of a $13,000,000 mezzanine loan to the Borrowers secured by the Borrowers' portfolio of multifamily residential buildings. A mezzanine loan is riskier for a lender than a traditional loan because the lender sits behind senior lenders in recovery, and therefore the borrower typically pays higher interest and/or the loan is accompanied by a pledge of equity in the entity that owns the property.

10. PR GIV funded the first $8,000,000 on November 15, 2023, and another $5,000,000 was funded a few weeks later (collectively the "**Loan**").

11. The Borrowers executed and delivered to PR GIV a full set of executed loan documents, including a Promissory dated November 15, 2023, in the principal amount of $13,000,000 ("**Note**") for repayment of the loan. A true copy of the Note is attached as **Exhibit A**.

12. Among other things, the Note provides for five percent (5.0%) annualized simple interest ($213,152.64), with a maturity date of March 15, 2024. Ex. A at 1. Upon an Event of Default, interest increased to ten percent (10%) annualized simple interest (the "Default Rate"). Ex. A at 1.

**B. <u>The Account Pledge Agreement</u>**

13. To secure repayment of the Note, on November 15, 2023, the Debtor, Davis, the Borrowers (collectively the "**Pledgors**"), and PR GIV entered into the Account Pledge Agreement attached as **Exhibit B**, pursuant to which, among other things, the Pledgors pledged as collateral to PR GIV sums they maintained in their respective accounts at United Bank (collectively the "**Accounts**").

14. Paragraph 7(B) of the Account Pledge Agreement required the Pledgors to deliver weekly to PR GIV an account report listing the balances in each account and aggregate balance in the Accounts. In addition, paragraph 7(C) of the Account Pledge Agreement required the Pledgors to maintain in the Accounts an aggregate balance of $18,200,000 (the "**Aggregate Minium Balance**").

15. To induce PR GIV to make the Loan, the Debtor presented to PR GIV forged bank statements falsely indicating that the Accounts had a balance of $18,200,000 when the true balance in the Accounts was approximately $3 million.

16. In addition, the Debtor was aware that Davis had altered and presented to PR GIV Davis's personal account statement that falsely indicated that Davis had approximately $7 million deposited at United Bank when, in fact, Davis had only a few hundred thousand dollars in his United Bank account.

17. The Debtor further altered the account number on his NYLife Securities, LLC Account No, xxx-xx3417 (the "**Securities Account**") to falsely indicate that the Securities Account has more money in the Securities Account than it actually had.

18. Had PR GIV known the true balance in the Accounts and Securities Account, PR GIV would not have made the Loan to the Borrowers.

## C. The Securities Account Control Agreement

19. To further secure repayment of the Securities Account, on November 15, 2023, the Debtor and NYLife Securities, LLC entered into a Securities Account Control Agreement attached as **Exhibit C** ("**Securities Account Control Agreement**").

20. In the Securities Account Control Agreement, the Debtor agreed to maintain the funds in the Securities Accounts with NYLife Securities, LLC.

21. Contrary to the terms of the Securities Agreement, in January 2024, the Debtor closed the funds in the Securities Accounts and moved them to Chasen Construction, LLC.

22. Had PR GIV known the Debtor was going to close and withdraw the funds in the Securities Account PR GIV would not have made the Loan.

**D. The Consulting Agreement**

23. On November 15, 2023, the Borrowers and PR GIV executed the Consulting Agreement attached as **Exhibit D** to provide for the payment of additional consideration that Borrowers agreed to pay to PR GIV.

24. Section 1 of the Consulting Agreement expressly states: "The Consultant [PR GIV LLC] has provided a loan to the Company in the original aggregate amount of $13,000,000, which loan is evidenced by a Note (the 'Note') to finance the acquisition and renovation of the Properties." Ex. D § 1.

25. Section 3 of the Consulting Agreement further provides that the Borrowers agree to pay PR GIV "on or before [the Loan Maturity Date] March 15, 2024, a flat fee in the aggregate amount of $2,386,847.36 (which amount will be increased to $4,986,847.36 in the event of a default under the Note)." Ex. D § 3.

26. Notably, when taken together with the simple interest of $213,152.64, the flat fee due under the Consulting Agreement ($2,386,847.36) reflects a fixed 20% return on the mezzanine financing ($2,600,000 on $13,000,000). This flat fee had the same maturity date as the Note ("on or before March 15, 2024") and could not be terminated until "the repayment in full of the GIV Note." Ex. D §§ 3, 5.

## E. The Guaranty

27. Another material inducement for PR GIV to loan money to the Borrowers was that on November 15, 2023, the principals of the Borrowers, Davis and the Debtor, executed and delivered the absolute, unconditional Guaranty in favor of PR GIV. Attached as **Exhibit E** is a true and correct copy of the Guaranty.

28. The Guaranty provides, in pertinent part, that Davis and the Debtor "absolutely, irrevocably and unconditionally guarantees (as a primary obligor and not merely as a surety) to Lender . . . the full and prompt payment of the principal, interest and other charges due and payable to Lender under the promissory notes evidencing the Loans (the 'Notes') or other Debt on the date the same shall become due and payable…." Ex. E ¶ 2.

29. The Guaranty defines the "Debt" to include the $13 million loan and "any other amounts that may from time to time be due and owing by the Borrower to the Lender, including all interest and default interest thereon." Ex. E, Recitals. The plain language of the Guaranty encompasses all monies owed under the Loan Documents,[2] as well as the Consulting Agreement.

30. The Guaranty states that it is "a guaranty of payment, not of collection," with "no conditions precedent to Guarantor's duty to make payment hereunder upon an event of default under any of the Notes." Ex. E ¶ 2.

## F. The Amended and Restated Borrower Operating Agreements

31. On November 15, 2023, the Debtor created amended and restated operating agreements for each of the Borrowers (collectively the "**Amended and Restated Operating Agreements**").

[2] The Note, together with the Consulting Agreement and Guaranty, are collectively referred to herein as the "Loan Documents."

32. Each of the Amended and Restated Operating Agreements added PR GIV as a member with voting rights, and specifically provided that amounts owed to PR GIV had to be repaid before the Borrowers received any money.

33. Contrary to the explicit provisions of the Amended and Restated Operating Agreements, in February 2024, without PR GIV's knowledge or consent as required by the Amended and Restated Operating Agreements, Debtor refinanced the Borrowers' real properties and used the cash to pay the Borrowers without first satisfying the Note.

34. Had PR GIV known that the Borrowers would pay themselves before satisfying the Note PR GIV would not have made the Loan.

## G. The Default and Acknowledgment

35. The Borrowers failed to repay the amounts due under the Note by the maturity date of March 15, 2024.

36. On March 15, 2024, PR GIV sent a Default Notice to the Borrowers and to the guarantors of the loan, Davis and the Debtor, declaring the entire outstanding principal balance immediately due and payable, invoking the Default Rate, and making clear that the increased flat fee of $4,986,847.36 "in the event of a default under the Note," Ex. D, Consulting Agreement § 3, was due. Attached as **Exhibit F** is a true and correct copy of the Default Notice that PR GIV's attorney sent on its behalf.

37. On March 16, 2024, Davis and the Debtor executed an Acknowledgment of Event of Default, in which they acknowledged and agreed that Events of Default had occurred and were continuing and that PR GIV was entitled to exercise all remedies under the Loan Documents.

38. Neither Davis nor the Debtor raised any objection to the amounts due under the Loan Documents in their Acknowledgment of the Event of Default. *See* Ex. G at 4.

**H. <u>Borrower's Failure to Pay the Amounts Due</u>**

39. Despite the Event of Default, Davis and the Debtor's own acknowledgment of it, and demand for payment, neither Davis nor the Debtor have paid the full amount of the debt due and owing under the Guaranty.

40. The amounts due upon default included: (a) the unpaid principal of $13,000,00; (b) simple interest of 5% between November 15, 2023, and March 15, 2024, which the Note itself states is $213,152.64; (c) annualized default interest accruing at 10% per annum since March 15, 2024; and (d) the Consulting Agreement fee of $4,986,847.36. These amounts total $18,200,000, plus default interest.

41. The Borrowers, Davis, and the Debtor have made certain partial payments towards payment of the debt. These payments total $12,886,374. In addition, the Debtor's chapter 7 trustee, Zvi Guttman, paid PR GIV $209,874 on December 19, 2025.

**I. <u>Amounts Owed</u>**

42. After crediting all payments received, Borrowers and the Guarantors still owe $5,634,147 in unpaid principal and the Consulting Agreement fee, plus $48,947 in accrued and unpaid default interest on the Note, for a total of $5,683,094 as of September 21, 2026, with default interest continuing to accrue on the Note at the Default Rate.

43. Default interest has accrued on the Note at the Default Rate of ten percent (10%) annualized simple interest from the Event of Default on March 15, 2024, through the present date (assumed to be September 21, 2026, for the purposes of this calculation), a period of 920 days. *See* Ex. A at 1. Default interest has been calculated on the outstanding principal balance of the Note on a declining basis, using a 365-day year: each payment received after the Event of Default is applied first to accrued and unpaid interest and then to reduce principal, and default interest

thereafter accrues on the reduced principal balance. This order of application follows the Guaranty, which provides that payments are applied "first to any fees or costs to which Lender may be entitled pursuant to the Debt, thereafter to any accrued but unpaid interest, and thereafter to principal." Ex. C ¶ 6.

44. Because the interest that accrued through the maturity date remained unpaid when the Event of Default occurred, the first payment received after March 15, 2024, was applied first to that accrued interest of $213,152.64, then to accrued default interest, and then to principal. Applying this methodology, the total default interest that has accrued on the Note from March 15, 2024, through September 21, 2026, is $369,469, as set forth in the chart below.

| **Default Interest Calculation (10% per annum, March 15, 2024 – September 21, 2026)** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | Days | Beginning Principal | Default Interest Accrued | Payment Applied | Applied to Interest | Applied to Principal | Ending Principal |
| 3/15/24-3/18/24 | 3 | $4,000,000[3] | $3,288 | $500,000 | $216,440 | $283,560 | $3,716,440 |
| 3/18/24-3/27/24 | 9 | $3,716,440 | $9,164 | $1,000,000 | $9,164 | $990,836 | $2,725,604 |
| 3/27/24-4/16/24 | 20 | $2,725,604 | $14,935 | $250,000 | $14,935 | $235,065 | $2,490,539 |
| 4/16/24-5/31/24 | 45 | $2,490,539 | $30,705 | $100,000 | $30,705 | $69,295 | $2,421,244 |
| 5/31/24-12/18/24 | 201 | $2,421,244 | $133,334 | $118,000 | $118,000 | $0 | $2,421,244 |
| 12/18/24-12/20/24 | 2 | $2,421,244 | $1,327 | $647,500 | $16,661 | $630,839 | $1,790,405 |
| 12/20/24-4/4/25 | 105 | $1,790,405 | $51,505 | $100,000 | $51,505 | $48,495 | $1,741,910 |
| 4/4/25-4/30/25 | 26 | $1,741,910 | $12,408 | $161,000 | $12,408 | $148,592 | $1,593,318 |
| 4/30/25-5/2/25 | 2 | $1,593,318 | $873 | $50,000 | $873 | $49,127 | $1,544,191 |
| 5/2/25-5/7/25 | 5 | $1,544,191 | $2,115 | $65,000 | $2,115 | $62,885 | $1,481,306 |

[3] Because the Borrowers paid $9,000,000 towards the Debt prior to their default, the principal owed at default was only $4,000,000.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5/7/25-6/5/25 | 29 | $1,481,306 | $11,769 | $50,000 | $11,769 | $38,231 | $1,443,075 |
| 6/5/25-6/19/25 | 14 | $1,443,075 | $5,535 | $20,000 | $5,535 | $14,465 | $1,428,610 |
| 6/19/25-6/27/25 | 8 | $1,428,610 | $3,131 | $100,000 | $3,131 | $96,869 | $1,331,741 |
| 6/27/25-6/30/25 | 3 | $1,331,741 | $1,095 | $100,000 | $1,095 | $98,905 | $1,232,836 |
| 6/30/25-7/1/25 | 1 | $1,232,836 | $338 | $175,000 | $338 | $174,662 | $1,058,174 |
| 7/1/25-7/2/25 | 1 | $1,058,174 | $290 | $225,000 | $290 | $224,710 | $833,464 |
| 7/2/25-8/22/25 | 51 | $833,464 | $11,646 | $15,000 | $11,646 | $3,354 | $830,110 |
| 8/22/25-12/19/25 | 119 | $830,110 | $27,064 | $209,874 | $27,064 | $182,810 | $647,300 |
| 12/19/25-9/21/26 | 276 | $647,300 | $48,947 | $0 | $0 | $0 | $647,300 |
| **Total** | **920** | | **$369,469** | | | | |

**Count I**
**(Fraud - 11 U.S.C. § 523(a)(2)(A))**

45. PR GIV hereby incorporates paragraphs 1 through 44 by reference.

46. In pertinent part, 11 U.S.C. § 523(a)(2)(A) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by … false pretenses, a false representation, or actual fraud."

47. The Debtor falsely represented: (a) the funds PR GIV loaned to the Borrowers would be used solely for the respective real properties each of the Borrowers owned; (b) to pledge to PR GIV as collateral deposits totaling $18.2 million in accounts the Debtor, Davis, and the Borrowers maintained at United Bank, as well as securities the Debtor maintained in the Securities Account; and (c) repay the Loan PR GIV before the Borrowers received any money (collectively the "**Representations**").

48. The Debtor knew the Representations were false when he made them.

49. The Debtor made the Representations with the intent and purpose of deceiving PR GIV.

50. PR GIV reasonably and justifiably relied upon the Representations.

51. PR GIV suffered damages as a proximate result of the false Representations.

52. Had PR GIV been made aware of the Debtor's actual intentions, PR GIV would not have made the Loan to the Borrowers.

WHEREFORE, PR GIV, by counsel, requests that the court: (1) determine PR GIV's claims against the Debtor to be non-dischargeable; and (2) grant such further relief the court deems appropriate.

**<u>Count II</u>**
**(Fraud - 11 U.S.C. § 523(a)(2)(B))**

53. PR GIV hereby incorporates paragraphs 1 through 52 by reference.

54. Bankruptcy Code § 523(a)(2)(B) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by:

(A) use of a statement in writing

i. that is materially false;

ii. respecting the debtor or an insider's financial condition;

iii. on which the creditor to whom the debtor is liable for such money, property services, or credit reasonably relied; and

iv. that the debtor caused to be made or published with the intent to deceive

55. The Representations were written statements that were materially false.

56. The Representations related to the Debtor and the Borrowers' respective financial conditions.

57. Davis and the Borrowers were insiders of the Debtor.

58. PR GIV reasonably and justifiably relied upon the Representations in extending credit to the Borrowers.

59. The Debtor caused the Representations to be made and submitted to PR GIV with the intent to deceive PR GIV into believing that the Note was sufficiently collateralized and that the Guarantors had the financial ability to satisfy the Loan.

60. PR GIV suffered damages as a direct and proximate result of the Debtor's false representations.

WHEREFORE, PR GIV, by counsel, requests that the court: (1) determine PR GIV's claims against the Debtor to be non-dischargeable; and (2) grant such further relief the court deems appropriate.

**Count III**
**(Willful and malicious injury - 11 U.S.C. § 523(a)(6))**

61. PR GIV hereby incorporates paragraphs 1 through 60 by reference.

62. Bankruptcy Code § 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

63. The Debtor intentionally misrepresented: (a) the value of the Accounts and Securities Accounts; (b) that the funds PR GIV loaned to the Borrowers would be used solely for the respective real properties each of the Borrowers owned; and (c) that PR GIV would be repaid before the Borrowers received any money.

64. The Debtor's actions were deliberate and intended to injure PR GIV.

65. PR GIV was injured as a direct and proximate result of the Debtor's false representations.

WHEREFORE, PR GIV, by counsel, requests that the court: (1) determine PR GIV's claims against the Debtor to be non-dischargeable; and (2) grant such further relief the court deems appropriate.

**Count IV**
**(Fraud or Defalcation in a Fiduciary Capacity, Embezzlement - 11 U.S.C. § 523(a)(4))**

66. PR GIV hereby incorporates paragraphs 1 through 65 by reference.

67. Bankruptcy Code § 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

68. As an officer and member of the Borrowers, the Debtor was a fiduciary who owed duties to PR GIV, which was also a member of the Borrowers.

69. The Debtor had a fiduciary duty not to falsely misrepresent his or the Borrowers' financial condition to PR GIV.

70. PR GIV has been harmed as a direct and proximate result of the Debtor misrepresenting: (a) the value of the Accounts and Securities Accounts; (b) that the funds PR GIV loaned to the Borrowers would be used solely for the respective real properties each of the Borrowers owned; and (c) that PR GIV would be repaid before the Borrowers received any money.

71. The Debtor initially obtained lawful possession of the Loan proceeds.

72. The Debtor subsequently used the Loan proceeds without authorization.

73. The Debtor acted knowingly and with the specific intent of depriving PR GIV of its money.

WHEREFORE, PR GIV, by counsel, requests that the court: (1) determine PR GIV's claims against the Debtor to be non-dischargeable; and (2) grant such further relief the court deems appropriate.

EISLER LAW, LLC

By: /s/ Alan D. Eisler

Alan D. Eisler, Bar No. 11524
1 Research Court, Suite 450
Rockville, MD 20850
Phone: (240) 283-1164
Fax: (301) 519-8005
Email: alan@alaneisler.com
Attorneys for PR GIV